NO. 07-08-0154-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

FEBRUARY 12, 2009
______________________________

JAKAN ARTHUR KENDRICK, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY;

NO. 1072467D; HONORABLE MICHAEL THOMAS, JUDGE
_______________________________


Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Appellant Jakan Arthur Kendrick appeals from his conviction by jury of aggravated
robbery with a deadly weapon and the trial courtâs sentence of forty-one years confinement
in the Institutional Division of the Texas Department of Criminal Justice.


 Appellant's
attorney has filed a brief in compliance with Anders v. California, 386 U.S. 738, 87 S.Ct.
1396, 18 L.Ed.2d 493 (1967) and In re Schulman, 252 S.W.3d 403 (Tex.Crim.App. 2008). 
Agreeing with appointed counselâs conclusion the record fails to show any arguably
meritorious issue that could support the appeal, we affirm the trial courtâs judgment. 
Â Â Â Â Â Â Â Â Â Â Appellant was charged by indictment with aggravated robbery with a deadly weapon,
based on events alleged to have occurred in Tarrant County in May 2007. The indictment
also contained a habitual offender notice. After the jury returned a verdict of guilty as
alleged in the indictment, appellant plead true to the habitual offender allegation. The trial
court heard punishment evidence and sentenced appellant to imprisonment for a term of
forty-one years. The trial court certified appellantâs right of appeal and this appeal
followed.
Â Â Â Â Â Â Â Â Â Â The record reflects that the State presented evidence to show that on May 31, 2007,
Eduardo Avendano was robbed of cash at gunpoint while working at a store. The robbery
was captured by the storeâs video system and the recording was admitted at trial without
objection and played before the jury. On that evening, one of two robbers asked Avendano
if he could cash a paycheck from a nearby company. Because the robber mentioned the
companyâs name, the investigating police officer showed the companyâs general manager
the video recording of the robbery. The manager identified one of the robbers as
appellant, a former employee. Avendano later positively identified appellant as the robber
who pulled out a handgun during the robbery.
Â Â Â Â Â Â Â Â Â Â Following the presentation of the evidence, the jury found appellant guilty as
charged in the indictment. Appellant went to the trial court for punishment and, as noted,
plead âtrueâ to the habitual offender notice. After receiving appellantâs plea of âtrueâ as well
as other evidence, the trial court assessed punishment against appellant at forty-one years
of confinement. Appellant timely appealed.
Â Â Â Â Â Â Â Â Thereafter, appellant's appointed appellate counsel has filed a motion to withdraw and
a brief in support pursuant to Anders in which she certifies that she has diligently reviewed
the record and, in her professional opinion, under the controlling authorities and facts of the
case, there is no reversible error or legitimate grounds on which a non-frivolous appeal can
arguably be predicated. The brief discusses in detail the procedural history of this case and
the events at trial. Counsel thoroughly discusses the applicable law and sets forth the
reasons she concludes there are no arguably meritorious appellate issues. Counsel has
certified that a copy of the Anders brief and motion to withdraw have been served on
appellant, and that counsel has advised appellant of his right to review the record and file
a pro se response. Johnson v. State, 885 S.W.2d 641, 645 (Tex.App.âWaco 1994, pet.
ref'd). By letter, this Court also notified appellant of his opportunity to submit a response
to the Anders brief and motion to withdraw filed by his counsel. Appellant has not filed a 
response.
Â Â Â Â Â Â Â Â Â Â In conformity with the standards set out by the United States Supreme Court, we will
not rule on the motion to withdraw until we have independently examined the record. 
Nichols v. State, 954 S.W.2d 83, 86 (Tex.App.âSan Antonio 1997, no pet.). If this Court
determines the appeal has merit, we will remand it to the trial court for appointment of new
counsel. Stafford v. State, 813 S.W.2d 503, 511 (Tex.Crim.App.1991).
Â 
Â Â Â Â Â Â Â Â Â Â Appellate counselâs brief discusses grounds on which a meritorious argument might
lie on appeal, and considers the application of each ground to this case. Counsel first
addresses potential issues concerning jurisdiction and jury selection. We agree that the
record does not support a contention with regard to either of these issues. Secondly,
counsel considers the legal and factual insufficiency of the evidence to support appellantâs
conviction. After a complete review of the record, however, we agree with appellate counsel
that evidentiary insufficiency grounds do not arguably support an appeal. Counsel next
discusses the jury charges at both guilt-innocence and punishment and concludes there is
no arguable issue for appeal on this point. We agree with counselâs conclusion.
Â Â Â Â Â Â Â Â Â Â Counsel then discusses issues pertaining to appellantâs punishment and concludes
there is no arguable such issue on appeal. We agree. The trial court assessed punishment
for appellant at forty-one years of confinement in the Institutional Division of the Texas
Department of Criminal Justice, a term within the permissible range. See Tex. Penal Code
Ann. Â§ 29.03(b) (Vernon 2003). It is the general rule that as long as a sentence is within
the proper range of punishment, it will not be disturbed on appeal. Jackson, 680 S.W.2d
at 814; Rodriguez v. State, 917 S.W.2d 90, 92 (Tex.App.âAmarillo 1996, pet. refâd) (Texas
courts have traditionally held that as long as the sentence is within the range of punishment
established by the Legislature in a valid statute, it does not violate state or federal
prohibitions).
Â Â Â Â Â Â Â Â Â Â Lastly, counsel identifies the possibility that appellant might argue he had received
ineffective assistance of counsel at trial. See Strickland v. Washington, 466 U.S. 668, 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984) and Hernandez v. State, 726 S.W.2d 53, 57
(Tex.Crim.App. 1986) (establishing standard for effective assistance of counsel). We agree
with counsel that the record contains no support for such a contention. 
Â Â Â Â Â Â Â Â Â Â Our review convinces us that appellate counsel conducted a complete review of the
record. We have also made an independent examination of the entire record to determine
whether there are any arguable grounds which might support the appeal from appellantâs
conviction and sentence. We agree the record presents no arguably meritorious grounds
for review. Accordingly, we grant counsel's motion to withdraw


 and affirm the judgment
of the trial court.Â 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â James T. Campbell

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Â 
Â 
Â 
Do not publish.

Â 
Â 



in-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:1;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-font-kerning:0pt;
 mso-bidi-language:EN-US;}
h2
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 2 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:2;
 font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
h3
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 3 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:3;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
h4
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 4 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:4;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-style:italic;}
h5
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 5 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:5;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 mso-bidi-language:EN-US;
 font-weight:normal;}
h6
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 6 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:6;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 mso-bidi-language:EN-US;
 font-weight:normal;
 font-style:italic;}
p.MsoHeading7, li.MsoHeading7, div.MsoHeading7
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 7 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:7;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoHeading8, li.MsoHeading8, div.MsoHeading8
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 8 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:8;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 mso-bidi-language:EN-US;}
p.MsoHeading9, li.MsoHeading9, div.MsoHeading9
 {mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-qformat:yes;
 mso-style-link:"Heading 9 Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 mso-outline-level:9;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoFootnoteText, li.MsoFootnoteText, div.MsoFootnoteText
 {mso-style-priority:99;
 mso-style-link:"Footnote Text Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoHeader, li.MsoHeader, div.MsoHeader
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Header Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoFooter, li.MsoFooter, div.MsoFooter
 {mso-style-priority:99;
 mso-style-link:"Footer Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoCaption, li.MsoCaption, div.MsoCaption
 {mso-style-noshow:yes;
 mso-style-priority:35;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 mso-pagination:widow-orphan;
 font-size:9.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.MsoFootnoteReference
 {mso-style-noshow:yes;
 mso-style-priority:99;
 vertical-align:super;}
span.MsoEndnoteReference
 {mso-style-noshow:yes;
 mso-style-priority:99;
 vertical-align:super;}
p.MsoEndnoteText, li.MsoEndnoteText, div.MsoEndnoteText
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Endnote Text Char";
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoTitle, li.MsoTitle, div.MsoTitle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpFirst, li.MsoTitleCxSpFirst, div.MsoTitleCxSpFirst
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpMiddle, li.MsoTitleCxSpMiddle, div.MsoTitleCxSpMiddle
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin:0in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoTitleCxSpLast, li.MsoTitleCxSpLast, div.MsoTitleCxSpLast
 {mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Title Char";
 mso-style-next:Normal;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:15.0pt;
 margin-left:0in;
 mso-add-space:auto;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD 1.0pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;
 mso-bidi-language:EN-US;}
p.MsoSubtitle, li.MsoSubtitle, div.MsoSubtitle
 {mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Subtitle Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst, div.MsoListParagraphCxSpFirst
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle, div.MsoListParagraphCxSpMiddle
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast, div.MsoListParagraphCxSpLast
 {mso-style-priority:34;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:.5in;
 mso-add-space:auto;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
p.MsoQuote, li.MsoQuote, div.MsoQuote
 {mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Quote Char";
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:black;
 mso-bidi-language:EN-US;
 font-style:italic;}
p.MsoIntenseQuote, li.MsoIntenseQuote, div.MsoIntenseQuote
 {mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-link:"Intense Quote Char";
 mso-style-next:Normal;
 margin-top:10.0pt;
 margin-right:.65in;
 margin-bottom:14.0pt;
 margin-left:.65in;
 line-height:115%;
 mso-pagination:widow-orphan;
 border:none;
 mso-border-bottom-alt:solid #4F81BD .5pt;
 padding:0in;
 mso-padding-alt:0in 0in 4.0pt 0in;
 font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 color:#4F81BD;
 mso-bidi-language:EN-US;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleEmphasis
 {mso-style-priority:19;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:gray;
 font-style:italic;}
span.MsoIntenseEmphasis
 {mso-style-priority:21;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.MsoSubtleReference
 {mso-style-priority:31;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 text-decoration:underline;
 text-underline:single;}
span.MsoIntenseReference
 {mso-style-priority:32;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 color:#C0504D;
 letter-spacing:.25pt;
 font-weight:bold;
 text-decoration:underline;
 text-underline:single;}
span.MsoBookTitle
 {mso-style-priority:33;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 font-variant:small-caps;
 letter-spacing:.25pt;
 font-weight:bold;}
p.MsoTocHeading, li.MsoTocHeading, div.MsoTocHeading
 {mso-style-noshow:yes;
 mso-style-priority:39;
 mso-style-qformat:yes;
 mso-style-parent:"Heading 1";
 mso-style-next:Normal;
 margin-top:24.0pt;
 margin-right:0in;
 margin-bottom:0in;
 margin-left:0in;
 margin-bottom:.0001pt;
 line-height:115%;
 mso-pagination:widow-orphan lines-together;
 page-break-after:avoid;
 font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 mso-bidi-language:EN-US;
 font-weight:bold;}
span.Heading1Char
 {mso-style-name:"Heading 1 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 1";
 mso-ansi-font-size:14.0pt;
 mso-bidi-font-size:14.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.EndnoteTextChar
 {mso-style-name:"Endnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Endnote Text";
 mso-bidi-language:EN-US;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-bidi-language:EN-US;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-08-0299-CV%20%20Opinion_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-08-0299-CV%20%20Opinion_files/header.htm") fcs;
 mso-endnote-separator:url("07-08-0299-CV%20%20Opinion_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-08-0299-CV%20%20Opinion_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-08-0299-CV%20%20Opinion_files/header.htm") f1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
-->








NO. 07-08-0299-CV

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL A 

Â 

 JULY 14, 2010



Â 

Â 



Â 

Â 

STEPHEN E. MARTIN, APPELLANT

Â 

v.

Â 

GENE OLIVER "BUDDY" COCKRELL, APPELLEE 



Â 

Â 



Â 

Â FROM THE 31ST DISTRICT
COURT OF GRAY COUNTY;

Â 

NO. 34,879; HONORABLE STEVEN R. EMMERT, JUDGE



Â 

Â 



Â 

Â 

Before CAMPBELL, HANCOCK and PIRTLE, JJ.

Â 

Â 

OPINION

Â Â Â Â Â Â Â Â Â Â Â  Appellant, Stephen E. Martin, appeals
from a judgment rendered in favor of Appellee, Gene Oliver "Buddy"
Cockrell, following a jury trial of Cockrell's declaratory judgment action
seeking to establish an equitable easement by estoppel across Martin's
property.Â  By seven
issues, Martin contends (1) the evidence is legally insufficient, (2) the
evidence is factually insufficient to support a finding of an easement in the
pasture road across his property, (3) Cockrell failed to submit or request jury
questions on one or more essential elements of his easement by estoppel claim,
(4) the Court's charge failed to properly instruct the jury on the nature and
scope of the easement claimed, (5) the trial court improperly expanded the
scope of the easement, (6) the jury erred in failing to award him damages for
Cockrell's trespass, and (7) the trial court erred in failing to award him
recovery of attorney's fees.Â  We reverse and render in part and
affirm in part.Â  Â Â 

Background

Â Â Â Â Â Â Â Â Â Â Â  At issue in this appeal is a pasture
road located in Gray County, Texas, that begins at the southern tip of County
Road 24 and traverses Martin's property south through Sections 113
and 84, Block M-2 of the BS&F Survey (Survey) to the northern middle
section of Cockrell's property, Sections 114 and 83, Block M-2 of the
Survey.Â  Following a jury trial, the
trial court issued a judgment awarding Cockrell, his heirs, successors and
assigns, a permanent equitable easement of ingress and egress over Martin's property
for agricultural purposes.

Â Â Â Â Â Â Â Â Â Â Â  The Joneses and Ingrums

Â Â Â Â Â Â Â Â Â Â Â  At
trial, Paul Jones testified his family built the pasture road on Sections 113
and 84 of Block M-2 of the Survey (the "Jones property") from a cow
trail in the late 1930s or early 1940s.Â  The
Jones family used the pasture road to tend to their cattle.Â  In 1941, the Ingrums purchased Sections 114
and 83 of Block M-2 of the Survey (the "Ingrum property"). Â The northern border of the Ingrum property abutted
the southern border of the Jones property.

Â Â Â Â Â Â Â Â Â Â Â  From
the early 1940s, Larry Ingrum testified the Ingrums usually used the pasture
road on the Jones property to exit their property and travel north to County Road
24.Â  They placed cattle in the pasture nearest
to the Jones property so they wouldn't have to ride two pastures.Â  The Ingrums would typically enter their
property from the west side, come down through the middle tending their cattle
and then exit their property using the pasture road on the Jones property.Â  At some indeterminate time, the Ingrums built
some cattle pens and a couple of windmills in the middle pasture and used the pasture
road on the Jones property to service the windmills.Â  Â Â 

Â Â Â Â Â Â Â Â Â Â Â  Ingrum testified there was a
gentlemen's agreement between his family and the Joneses permitting the Ingrums
to enter and exit their property over the pasture road on the Jones property.Â  There was no written agreement or contract.Â  The Ingrums used the pasture road on the
Jones property "by friendly neighbourly permission"--"[b]oth
sides just did what they did." Ingrum further testified they "never
claimed to have a legal right to use the road" and agreed that their right
to use the road was "consistent with friendly permission."Â  

Â Â Â Â Â Â Â Â Â Â Â  Jones
testified his family didn't have "a problem with [the Ingrums] using the road," the two families were "just
friends"---"friendly use of the road."Â  He testified "[n]obody ever asked
permission to use the road and permission was never given."Â  Jones testified that on two different
occasions, one of Ingrum's hands pulled off the road onto the pasture and damaged
his grass.Â  He testified he told the
Ingrums he wanted it stopped and it stopped.Â 
He also testified his family "never gave anyone an easement to use
the road."Â  

Â Â Â Â Â Â Â Â Â Â Â  The
Martins and Cockrells

Â Â Â Â Â Â Â Â Â Â Â  In 2000,
Alice Ingrum Gray inherited the Ingrum property.Â  She had two sons, Gene Oliver
"Buddy" Cockrell and Lee Cockrell, Alice's guardian.Â  Also, in 2000, Martin purchased the Jones property
from Paul Jones.[1]

Â Â Â Â Â Â Â Â Â Â Â  From 2001 to 2006, Martin leased the
Ingrum property
from May to October of each year for grazing purposes.Â  During the lease periods, between 2003 and 2006,
Martin's wife, Susan, cared for their cattle on the Ingrum property approximately
three times a week.Â  Because the Martins
were not living on the Martin property at the time, Susan would enter and exit the Ingrum property via Gray County Road 22 off
Highway 152, or she would cross the Ingrum property and exit on County
Road 26. Â She testified it was
unnecessary for her to use the pasture road in dispute to care for their cattle
on the Ingrum property.Â  When accessing
the north middle pasture on the Ingrum's property, the difference between using
the disputed pasture road and Ingrum's entry roads was simply a matter of
convenience, rather than necessity.Â  The distance
required to travel to access the north middle of the Ingrum property from
Ingrum's road was approximately eight miles, whereas access via the disputed
pasture road was approximately five miles.Â 
Â Â 

Â Â Â Â Â Â Â Â Â Â Â  Susan
also testified the Ingrum roads were "perfectly good" and provided
access to the Ingrum windmills and caliche pit.Â 
If the Ingrum roads were graded, she testified they could drive large
water testing trucks or windmill service trucks over the roads.Â  While caring for the cattle on the Ingrum property,
Susan drove a one-ton pickup truck with a sixteen foot gooseneck trailer.

Â Â Â Â Â Â Â Â Â Â Â  Between 2000 and 2002, Martin did
not observe anyone, or evidence of anyone, traveling over the disputed pasture
road.Â  In 2002, however, Martin gave Gray
County permission to use the pasture road to haul caliche dug from a pit on the
Ingrum property.[2]Â  Gray County Commissioner Joe Wheeley
testified Martin gave the county permission to haul caliche across the pasture
road via a "gentlemen's agreement," not a formal easement.

Â Â Â Â Â Â Â Â Â Â Â  In
order to use the pasture road year-round to haul caliche, with Martin's
permission, the county applied caliche to the road.[3]Â  For their convenience, the county also
installed a culvert or cattle guard where the Ingrum property adjoined the
Martin property and, to protect the county's caliche, Martin installed a
combination lock at the point of entry to the Ingrum property from the pasture
road in 2002.Â  When the county ceased hauling
caliche in 2006, the county removed the culvert or cattle guard, removed the
caliche from a portion of the pasture road, and plowed and seeded the roadway
to return the pasture road to its original condition per Martin's request.

Â 
Â Â Â Â Â Â Â Â Â  In
November 2006, Cockrell asked Martin for the combination to the locked gate between
the Ingrum and Martin properties in order to check the windmills located in Ingrum's
middle pasture.Â  Martin gave Cockrell the
combination.Â  Three days later, Marshall
Hopkins began parking heavy equipment on Martin's property intending to haul
caliche out of the Ingrum pit to satisfy his requirements for a local job for
Teja Feeders.Â  When Martin questioned
Hopkins's use of the pasture road, Hopkins told Martin that Cockrell had given him
permission to haul the caliche over the pasture road.Â  Martin refused to allow Hopkins use of the
road and Hopkins removed his equipment.Â 
Days later, Martin installed a combination lock on the gate located at
the juncture of County Road 24 and the pasture road on his property.Â  He did not give this combination to
Cockrell.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
April 2007, Cockrell agreed to settle his mother's estate with his brother.Â  As a result of the settlement, Cockrell
received the Ingrum Property.[4]Â  Shortly thereafter, Cockrell informed Martin
that he would not lease his pasture to Martin because he was giving his middle pasture
a rest.[5]Â  Later, Cockrell called Martin and asked for
the combination to the lock on the gate where County Road 24 met the pasture
road on Martin's property.Â  Martin agreed
to meet Cockrell at the gate and let him in and out.Â  Cockrell responded that the arrangement was
unworkable.Â  In June or July 2007,
Cockrell again approached Martin in order to obtain the combination to the
locked gate and Martin refused to give Cockrell the combination.[6]Â  Shortly thereafter, Cockrell filed suit to
obtain use of the pasture road.Â  

Â Â Â Â Â Â Â Â Â Â Â  Court
Proceedings

Â Â Â Â Â Â Â Â Â Â Â  On August 17, 2007, Cockrell filed a
petition seeking a temporary injunction restraining Martin from denying him
access to the Cockrell property over the pasture road on Martin's property.Â  After a hearing on September 14, 2007, the
trial court granted a temporary injunction enjoining Martin from restricting
Cockrell's use of the pasture road for agricultural purposes.Â  

Â Â Â Â Â Â Â Â Â Â Â  After the temporary restraining
order, Martin gave Cockrell the combination to the lock installed on Martin's
gate between County Road 24 and the pasture road.Â  Thereafter, Cockrell and Hopkins traversed
the pasture road with heavy equipment to remove caliche from the pit to shore
up a windmill on the Cockrell property.Â 
In the process, they drove off the pasture road into Martin's pasture.

Â Â Â Â Â Â Â Â Â Â Â  On
January 16, 2008, Martin counterclaimed against Cockrell for possession of the
pasture road, an order barring Cockrell from using the pasture road, trespass,
and damages to repair his pasture.Â  On
January 31, 2008, Cockrell filed his first amended petition asserting a
permanent equitable easement or easement by estoppel permitting him to use the pasture
road on Martin's property.Â  On February
11, 2008, Cockrell also filed a supplemental petition requesting that the trial
court declare him an equitable easement over the pasture road pursuant to the
Texas Declaratory Judgment Act and award him recovery of reasonable attorney's
fees. 

Â Â Â Â Â Â Â Â Â Â Â  Following a two-day trial, the jury
found that Cockrell had an equitable easement to use the pasture road, Cockrell trespassed on Martin's property when Hopkins's
equipment was driven outside the pasture road, Cockrell's use of a passageway
alongside the pasture road was not privileged, and Martin was entitled to no
damages for Cockrell's trespass.Â  On June
12, 2008, the trial court entered judgment granting Cockrell a permanent
easement of ingress and egress over the pasture road on Martin's property for
agricultural purposes and that Martin take nothing as to his counterclaim.Â  Martin gave timely notice of appeal.

Discussion

I. Legal Sufficiency

Â Â Â Â Â Â Â Â Â Â Â  A.Â 
Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  In
conducting a legal sufficiency review, we must consider the evidence in the
light most favorable to the challenged finding, indulge every reasonable
inference to support it; City of Keller
v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005), and credit favorable evidence
if reasonable jurors could while disregarding contrary evidence unless
reasonable jurors could not.Â  Id. at 827.Â  A challenge to legal sufficiency will be
sustained when, among other things, the evidence offered to establish a vital
fact does not exceed a scintilla.[7] Id. at 810.Â  In
addition, so long as the evidence falls within the zone of reasonable
disagreement, we may not invade the fact-finding role of the jurors, who alone
determine the credibility of witnesses, the weight to be given their testimony,
and whether to accept or reject all or part of their testimony.Â  Wilson,
168 S.W.3d at 822.Â 
Generally, if an appellate court sustains a "no evidence" or
"legal sufficiency" issue, the appellate court must reverse and also
render judgment.Â  See In re State ex rel. K.D.C., 78 S.W.3d 543,
551 (Tex.App.--Amarillo 2002, no pet.) (citing Vista Chevrolet, Inc. v. Lewis, 709
S.W.2d 176, 176 (Tex. 1986)).Â  

Â Â Â Â Â Â Â Â Â Â Â  B.Â 
Easement by Estoppel

Â Â Â Â Â Â Â Â Â Â Â  The
doctrine of equitable estoppel or estoppel in
pais is an exception to the statute of frauds;[8]
Cleaver v. Cundiff, 203 S.W.3d 373,
375 (Tex.App.--Eastland 2006, no pet.), and, "[b]eing a creature of
equity, it seeks to prevent injustice and to protect innocent parties from
fraud."Â  Storms v. Tuck, 579 S.W.2d 447, 451
(Tex. 1979).Â  Under this doctrine,
a landowner may be estopped from denying the existence of an easement created
by "representations" upon which another has detrimentally
relied.Â  Cleaver, 203 S.W.3d at 375.Â  The doctrine was first discussed in Texas
jurisprudence more than 125 years ago when the Supreme Court articulated the
rationale for the doctrine of easement by estoppel:

The owner of land
may create an easement by a parol agreement or representation which has been so
acted on by others as to create an estoppel en
pais.Â  As where he has by parol
agreement granted a right to such easement in his land, upon the faith of which
the other party has expended moneys which will be lost and valueless if the
right to enjoy such easement is revoked, equity has enjoined the owner of the
first estate from preventing the use of it.

Â 

F.J.
Harrison & Co. v. Boring & Kennard, 44 Tex.
255, 267-68 (1875).

Â Â Â Â Â Â Â Â Â Â Â  Essentially, estoppel in pais holds that the owner of a
servient estate may be estopped to deny the existence of an easement[9]
by making representations that have been acted upon by the owner of the
dominant estate to his detriment; Storms,
579 S.W.2d at 451, and "is grounded on the condition that justice forbids
one to gainsay his own acts or assertions."Â  Wallace v. McKinzie, 869 S.W.2d 592, 595 (Tex.App.--Amarillo 1993,
writ denied).Â  Each case in which
equitable estoppel is sought to be applied must rest upon its own facts.Â  Vrazel v. Skrabanek, 725 S.W.2d 709, 711 (Tex. 1987).[10]


Â Â Â Â Â Â Â Â Â Â Â  The
gravity of a judicial means of acquiring an interest in land of another solely
by parol requires that equitable estoppel be strictly applied; Allen v. Allen, 280 S.W.3d 366, 381
(Tex.App.--Amarillo 2008, pet. denied) (citing Moore County v. Bergner, 526 S.W.2d 702, 706
(Tex.Civ.App.--Amarillo 1975, no writ)), and the estoppel "should be
certain, precise and clear."Â  Id. (citing McAnally v. Friends of WCC, Inc., 113 S.W.3d 875, 879
(Tex.App.--Dallas 2003, no pet.)).Â  

Â Â Â Â Â Â Â Â Â Â Â  Three elements are necessary to
create an easement by estoppel:Â  (1) a
representation of the easement communicated, either by words or action, to the promisee;
(2) the communication was believed; and (3) the promisee detrimentally relied
on the communication.Â  Storms, 579 S.W.2d at
452.Â  See Allen, 280 S.W.2d at 381; McKinzie, 869 S.W.2d at 595.[11]Â  Further, once created, an easement by
estoppel is binding on the successors in title to the servient estate if
reliance upon the existing easement continues.Â 
Cleaver, 203
S.W.3d at 375; Holden v. Weidenfeller,
929 S.W.2d 124, 131 (Tex.App.--San Antonio 1996, writ denied). 

Â Â Â Â Â Â Â Â Â Â Â  To establish the first element, Cockrell
relies upon the legal fiction of representation by silence.Â  "The principle of estoppel by silence arises where a person is
under a duty to another to speak, but refrains from doing so and thereby leads
the other to act in reliance on a mistaken understanding of the facts.Â  The duty to speak does not arise until the
silent party is himself aware of the facts."Â  Storms,
579 S.W.2d at 452. 




C.Â 
The Pasture Road

Â Â Â Â Â Â Â Â Â Â Â  At trial, Cockrell
asserted[12]
the Ingrums obtained an easement by estoppel over the pasture road due to
Jones's silence and acquiescence in the IngrumsÂ use of the pasture road for
approximately fifty-five years.[13]Â  And, after Jones transferred the property to
Martin and Cockrell came to own the Ingrum property, he asserted that he succeeded
to the Ingrum easement by estoppel and/or, in the alternative, obtained an
easement by estoppel over the pasture road via Martin's silence and acquiescence
in his subsequent use of the pasture road.

Â Â Â Â Â Â Â Â Â Â Â  1.Â  Ingrum and Jones

Â Â Â Â Â Â Â Â Â Â Â  Because
Cockrell relies on the silence and acquiescence of the Jones family in
establishing an easement by estoppel in favor of his predecessors in title, the
Ingrums, we will first consider whether Cockrell adduced any evidence that the
Joneses had a duty to speak.Â  That is, did
the Joneses owe a duty to advise the Ingrums that they were permissive users of
the pasture road?Â  We will then consider
whether there is any evidence the Joneses made any representation of an
easement to the Ingrums that was believed and acted on by the Ingrums to their
detriment. 

Â Â Â Â Â Â Â Â Â Â Â  Having reviewed the entire record,
we find no evidence to establish that the Joneses had any duty to make such a
representation to the Ingrums.Â  Rather,
all of the evidence adduced at trial indicates that both the Ingrums and the
Joneses understood that the IngrumsÂ use of the pasture road was by
"friendly neighbourly permission."Â Â Â 


Â Â Â Â Â Â Â Â Â Â Â  Neither
is there any evidence of extenuating circumstances that would establish such a
duty on behalf of the Joneses.Â  The
record is devoid of any evidence establishing the Ingrums expended any money or
effort on the construction or upkeep of the pasture road[14]
or, relying on the pasture road, made any substantial or permanent improvements
to their property of which the Joneses were aware.[15]Â  Furthermore, distinguishing this case from
other cases involving landlocked tracts,[16]
here there were alternative means of ingress and egress to the Ingrum or
Cockrell property without use of the disputed pasture road.[17]Â  In short, there is no evidence that the Joneses
were aware of any facts that would give rise to a duty to advise the Ingrums
that they were permissive users of the pasture road in order to avoid the
imposition of an easement by estoppel. Â Â 

Â Â Â Â Â Â Â Â Â Â Â  Â Moreover, even if the Joneses had a duty to
speak and their silence or acquiescence constituted a representation, there is
no evidence the Ingrums "believed" such a representation.Â  To the contrary, Ingrum's testimony
establishes he "believed" his family used the pasture road with the
"neighbourly permission" of the Joneses. Â Neither is there any evidence that the Ingrums
relied to their detriment on any representation, silent or spoken, by the
Joneses.[18]Â  

Â Â Â Â Â Â Â Â Â Â Â  Cockrell
contends that the McKinzie case
stands for the proposition that the doctrine of equitable estoppel requires no
more than mere silence when one who, by his silence, induces another to act in
a particular manner and then attempts to adopt an inconsistent position that
would cause loss or injury to the relying party.Â  Cockrell's reliance on the McKinzie case is, however,
misplaced.Â  In McKinzie, there was some evidence that the relying party "believed"
the landowner's silence was a representation of an easement, i.e., McKinzie
filed an affidavit in the deed records of Kent County claiming an easement over
the roads on Wallace's property for the purpose of ingress and egress to his
landlocked property.Â  869
S.W.2d at 595.Â  In addition,
McKinzie testified that, after a conversation with Wallace, he believed he had
an easement and in reliance thereon maintained the access road and made
improvements to his property.Â  Id.Â  Here,
all the evidence is to the contrary, i.e., the Ingrums believed their use was
permissive, did not construct or maintain the disputed pasture road and
Cockrell adduced no evidence that the Ingrums relied on use of the road to make
any substantial or permanent improvements to their property.

Â Â Â Â Â Â Â Â Â Â Â  Accordingly, considering the
evidence in the light most favorable to the jury's finding of an easement by
estoppel while indulging every reasonable inference to support it, we find the
evidence offered in support of an easement by estoppel by virtue of the
relationship between the Joneses and the Ingrums, does not exceed a
scintilla.Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  2.Â 
Cockrell and Martin

Â Â Â Â Â Â Â Â Â Â Â  Cockrell's
evidence in support of an easement by estoppel due to any relationship between
Cockrell and Martin is even more tenuous.Â 
Martin purchased the Jones property in 2000.Â  From that point, Cockrell contends two fact
scenarios gave rise to an easement by estoppel.Â 
One, from 2001 to 2006, Martin entered into a series of grazing leases
with Lee Cockrell as Alice Ingrum Gray's guardian, where he used the disputed pasture
road to access the Ingrum property and, two, from 2002 to 2006,
Martin gave Gray County permission to haul caliche from the Cockrell property
over the pasture road to County Road 24.Â 


Â Â Â Â Â Â Â Â Â Â Â  That Martin may have used a pasture
road on his own property to care for his cattle grazing on the Ingrum property
pursuant to a lease is of no moment.Â 
"[O]ne cannot be said to have an easement in lands, the fee simple
to which is in himself."Â  Othen v. Rosier, 148 Tex. 485, 226 S.W.2d 622, 625 (1950).[19]Â  A landlord/tenant relationship does not
create a vendor/vendee relationship.Â  See Allison, 836 S.W.2d at 188 ("[s]ince
there was no prior common ownership of the tracts, no
vendor/vendee relationship existed between the parties").Â  Furthermore, with respect to Gray County's
use of the pasture road, Martin had a "gentlemen's agreement" with Gray
County Commissioner Wheeley permitting the county to use the pasture road for a
specific purpose.Â  Martin's agreement
with Wheeley could not have created an easement in favor of Cockrell.Â  Therefore, neither of these two scenarios
gave rise to an easement by estoppel.Â Â Â  Â Â Â Â Â Â Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  In 2006, Cockrell received the
combination to the lock between the Ingrum and Martin properties for the
purpose of checking on his windmills.Â 
However, three days later, when Marshal Hopkins began parking his heavy
equipment on Martin's property in anticipation of using the pasture road to
haul caliche from the Ingrum property, Martin denied Hopkins use of the pasture
road and days later installed a combination lock on the gate where County Road
24 met the pasture road at the entrance of his property.Â  Further, in June or July 2007, after Cockrell
obtained title to the Ingrum property, Martin refused to give Cockrell the
combination to the lock.

Â Â Â Â Â Â Â Â Â Â Â  Under the circumstances, Martin had
no duty to speak and made no representation to Cockrell.Â  Giving Cockrell the combination to the locked
gate between the Ingrum and Martin properties was more in the nature of giving
a license in real estate[20]
rather than creating an easement.Â  See Machala v. Weems, 56
S.W.3d 748, 760 (Tex.App.--Texarkana 2001, no pet.).Â  Martin could have changed combinations at any
time.Â  In addition, there is no evidence
Martin had made any representation to Cockrell that would have required him to
give Cockrell a new combination to the gate.Â 
Rather, the evidence shows that, only days later, Martin denied entry to
Hopkins when he requested use of the pasture road to haul caliche from the pit
located on the Cockrell's property and thereafter refused to give Cockrell the
combination to the locked gate at the entrance of the pasture road off County
Road 24.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
addition, like the relationship between the Joneses and the Ingrums, there was
no evidence of common ownership of the tracts, no vendor/vendee relationship and
no probative evidence of fraud, actual or constructive, perpetrated upon
Cockrell.Â  Neither was there any evidence
of misrepresentations or overreaching conduct by Martin.Â  

Â Â Â Â Â Â Â Â Â Â Â  Accordingly, we sustain MartinÂs
first issue.Â  Because our finding
pretermits issues two through five, we will next consider issues six and seven.

II.Â  Nominal Damages

Â Â Â Â Â Â Â Â Â Â Â  The
jury found that Cockrell trespassed on Martin's property when Hopkins drove his
equipment outside the pasture road, proximately causing damages to Martin's
property.Â  The jury further found the use
of a passageway alongside the pasture road was not privileged.Â  Nonetheless, in response to the question as
to what sum of money, if paid now in cash, would fairly and reasonably
compensate Martin for his damages, the jury answered: "$ - 0 -
."Â  In accordance with the jury's
verdict, the trial judge ordered that Martin "take nothing" by virtue
of his counterclaim against Cockrell.

Â Â Â Â Â Â Â Â Â Â Â  Martin
contends that because the jury found a trespass, and no privilege, he is
entitled to "nominal damages" as a matter of law.Â  Martin relies solely upon the case of General Mills Restaurants, Inc. v. Texas
Wings, Inc., 12 S.W.3d 827, 833 (Tex.App.--Dallas 2000, no pet.), as
support for his proposition of law.Â  His
reliance upon this authority is misplaced because General Mills arises in the procedural context of a no-evidence
motion for summary judgment.Â  There, the
appellate court found that the trial court erred when it granted the appellee's
no-evidence summary judgment based upon an absence of evidence of damages on
appellee's claim. 

Â Â Â Â Â Â Â Â Â Â Â  Here, Martin's claim is essentially
a contention that the jury's finding is not supported by the evidence, or is
against the great weight and preponderance of the evidence.Â  A review of the record, however, reveals that
it is devoid of any evidence establishing that Martin expended any money or
effort repairing any damages caused by Cockrell's vehicles or equipment being
driven outside the pasture road.Â 
Although there was testimony concerning the efforts necessary to restore
the pasture road to its original condition after Gray County ceased using the
road, no similar evidence was ever presented which would have allowed a jury to
attach a monetary figure to any efforts to restore the adjacent passageway
after Cockrell's usage.Â  The jury was the
sole judge of the evidence and it alone was entitled to make credibility
determinations as to the weight and sufficiency of the evidence.Â  Based upon the record before us, we cannot
say that the jury's decision to deny recovery of damages for this trespass was
so against the great weight and preponderance of the evidence as to be clearly
wrong or manifestly unjust.Â  Martin
simply failed to carry his burden of proof.Â 
Accordingly, his sixth issue is overruled.

III.Â  Attorney's Fees

Â Â Â Â Â Â Â Â Â Â Â  In his
Original Verified Petition filed August 17, 2007, Cockrell asserted he was
entitled to an easement by prescription over the pasture road because of past
use that was "open, notorious, continuous, exclusive and
adverse."Â  On January 31, 2008,
Cockrell amended his petition, in part, eliminating his assertion of an easement
by prescription.Â  Martin asserts that he
is entitled to reasonable and necessary attorney's fees in defending against
Cockrell's claim of easement by prescription pursuant to Section 16.034 of the
Texas Civil Practice and Remedies Code.Â 
See Tex. Civ. Prac. & Rem. Code Ann. Â§ 16.034
(Vernon 2002).[21]

Â Â Â Â Â Â Â Â Â Â Â  A.Â  Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  Because
the award of attorney's fees rests in the sound discretion of the trial court,
the judgment will not be reversed on appeal without a clear showing of abuse of
discretion.Â  Ridge Oil Co., Inc. v. Guinn Invs., Inc., 148
S.W.3d 143, 163 (Tex. 2004).Â  See Smith v. McCarthy, 195 S.W.3d 301,
303 (Tex.App.--Fort Worth 2006, pet. denied) (section 16.034 provides for a
discretionary award of attorney's fees).Â 
A trial court abuses its discretion when it acts arbitrarily and
unreasonably, or without reference to guiding rules and principles.Â  City of Amarillo v. Glick, 991 S.W.2d 14, 17 (Tex.App.--Amarillo
1997, no pet.) (citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.
1985), cert. denied, 476 U.S. 1159,
106 S.Ct. 2279, 90 L.Ed.2d 721 (1986)).

Â Â Â Â Â Â Â Â Â Â Â  B.Â  Section 16.034

Â Â Â Â Â Â Â Â Â Â Â  Section
16.034 states, in pertinent part, as follows:

In a suit for the
possession of real property between a person claiming under record title to the
property and one claiming by adverse possession, if the prevailing party
recovers possession of the property from a person unlawfully in actual
possession, the court may award costs and reasonable attorney's fees to the
prevailing party.

Â 

Section
16.034(a).[22]

Â 

Â Â Â Â Â Â Â Â Â Â Â  The
pleadings make clear that at no point did this case involve a claim by Cockrell
for adverse possession and there was no adjudication that either party was
unlawfully in actual possession of the other's property.Â  While Martin seeks to equate Cockrell's claim
of prescriptive easement to an adverse possession claim there is a fundamental
difference between the two, i.e., an
adverse possession claim asserts a right to ownership of land while a claim of
prescriptive easement asserts a privilege of using the land.Â  Although the elements of the two claims may
be quite similar; Othen, 226 S.W.2d
at 492, their practical effect is significantly different.Â  Because Cockrell made no claim of adverse
possession, section 16.034 is inapplicable and the trial court did not abuse
its discretion by denying Martin's request for attorney's fees.[23]Â  Martin's seventh issue is overruled.

CONCLUSION

Â Â Â Â Â Â Â Â Â Â Â  We
reverse that portion of the trial court's judgment awarding a permanent
equitable easement and render judgment that Cockrell take nothing as to his
claims against Martin; we affirm that portion of the trial court's judgment
decreeing that Martin take nothing as to his counterclaim against Cockrell and,
in light thereof, we also reverse the trial courtÂs assessment of costs against
Martin and render judgment against Cockrell for all costs of court.Â  Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Patrick
A. Pirtle

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â  JusticeÂ  Â Â  

Â Â Â Â Â Â Â Â Â Â Â  











[1]Hereinafter,
the "Jones Property" will be referred to as the "Martin
Property."





[2]Lee Cockrell, as Alice Ingrum Gray's
guardian, had entered into an agreement to sell caliche to Gray County for
fifty cents a yard.Â  





[3]Otherwise,
rain would make the pasture road nearly impassable even for a pickup truck.





[4]On
July 3, 2007, the Ingrum property was deeded to Cockrell by Jerry G. Davis,
Independent Administrator of the Estate of Alice B. Ingrum Gray, Deceased.Â  Cockrell testified that, when negotiating a
settlement of his mother's estate with his brother, he took into account the
county's contract to haul caliche which paid ten thousand dollars a year and
use of the pasture road over the Martin property.Â  Hereinafter, the "Ingrum Property"
will be referred to as the "Cockrell Property."Â  





[5]Cockrell
subsequently entered into grazing leases with a relative who paid more for the
leases than Martin was paying.





[6]Mike
Voss of Mike's Water Well Service testified he did his first job for Cockrell
in early spring 2007.Â  He testified he
repaired three of Cockrell's windmills, all in bad shape.Â  He further testified the pasture road
facilitates work on the windmills and was "the only entrance that we had
with our equipment to get in there."Â 
Susan Martin testified there were other roads on the Ingrum property
from where access could be had to the windmills although it might be necessary
to blade them to accommodate windmill servicing trucks.Â Â Â  





[7]Less
than a scintilla of evidence exists when the evidence is so weak as to do no
more than create a mere surmise or suspicion of fact.Â  King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541 U.S. 1030, 124 S.Ct.
2097, 158 L.Ed.2d 711 (2004).





[8]Section
26.01 of the Texas Business and Commerce Code provides that a promise or
agreement for the sale of real estate is not enforceable unless the promise or
agreement, or a memorandum of it, is in writing and signed by the person
charged with the promise or agreement or by someone lawfully authorized to sign
for him.Â  Tex. Bus. &
Com. Code Ann. Â§ 26.01 (Vernon 2009).Â 
See Tex. Prop. Code Ann. Â§
5.021 (Vernon 2004).





[9]An
easement confers on one person the right to use the land of another for a specific
purpose; Hubert v. Davis, 170 S.W.3d
706, 710 (Tex.App.--Tyler 2005, no pet.), but does not convey title to the
property.Â  South Plains Switching, Ltd., Co. v. BNSF
Railway Co., 255 S.W.3d 690, 707 (Tex.App.--Amarillo 2008, pet. denied).Â  See Stephen F. Austin State University v. Flynn, 228 S.W.3d 653,
658 (Tex. 2006).Â  It is a burden
on one estate, the servient estate, for the benefit of another, the dominant
estate.Â  Miller v. Babb, 263 S.W.253, 254 (Tex.
Comm'n App. 1924, judgm't adopted).Â Â Â Â Â Â 






[10]Application
of the doctrine has been "rare and nebulous" in circumstances other
than the three circumstances described by the Texas Supreme Court in Drye v. Eagle Rock Ranch, Inc., 364
S.W.2d 196, 209-10 (Tex. 1958):Â  (1) a
dedication of a street, alley or square; (2) an owner selling land with
reference to a map or plat; and (3) a seller of land who allows its purchaser
to expend money on an alleged "servient" estate.Â  Id.Â  See Scott v. Cannon, 959 S.W.2d 712, 720
(Tex.App.--Austin 1998, pet. denied).Â  None
of these circumstances exist here.





[11]These elements apply at the time the
communication creating the alleged easement is made.Â  Vinson v. Brown, 80 S.W.3d 221, 229 (Tex.App.--Austin 2002, no
pet.) (citing Lakeside Launches, Inc. v. Austin Yacht Club, Inc., 750 S.W.2d 868,
872 (Tex.App.--Austin 1988, writ denied)).Â 






[12]Cockrell had the burden at trial to
prove an easement by implication.Â  See Miller v. Elliot, 94 S.W.3d 38, 43
(Tex.App.--Tyler 2002, pet. denied).Â  





[13]Cockrell
did not assert at trial there was any prior common ownership of the Ingrum and
Jones properties or that any vendor/vendee relationship ever existed between
the owners of the properties.Â Â  Neither
is there any evidence of record that any fraud, actual or constructive, was
perpetrated by any owner of either property.Â 






[14]"The
doctrine of estoppel in pais has been
applied when the seller allows the purchaser to expend money on the 'servient'
tract, as for example a drainage ditch across the grantor's land, or a house or
other structure which encroaches on the land of the 'servient' estate'; Drye, 364 S.W.2d at 210.Â  See Storms, 579 S.W.2d at 453; Murphy
v. Long, 170 S.W.3d 621, 628 (Tex.App.--El Paso 2005, pet. denied).





[15]Where
there is little or no evidence that the owner of the "servient" estate
was aware that the alleged owners of a "dominant" estate made any
substantial improvements to their property, there is no duty to speak.Â  Wilson v. McGuffin, 749 S.W.2d 606, 611 (Tex.App.--Corpus Christi
1988, writ denied).Â  Here, there
was no testimony by Jones or Ingrum that Jones was aware of any improvements
made by the Ingrums on their property.Â Â  





[16]See, e.g., Cundiff, 203 S.W.3d at 376 (nearly one hundred years of use and landlocked
claimant built and maintained the road and made improvements on his property); Weidenfeller, 929 S.W.2d 124, 131
(Tex.App.--San Antonio 1996, writ denied) (more than fifty years and landlocked
claimant contributed to road maintenance, built a large house on the property
and presented evidence of significant amounts of labor and money being expended
to improve claimant's property); Russ v.
Womack, No. 13-08-0002-CV, 2008 Tex. App. LEXIS 8361, *12 (Tex.App.--Corpus
Christi Nov. 6 2008, no pet.) (not designated for publication) (twelve years during which landlocked families built homes
and made improvements without objection); Thompson
v. Houk, No. 12-04-00315-CV, 2005 Tex. App. LEXIS 6875, at *8 (Tex.App.ÂTyler
Aug. 24, 2005, no pet.) (not designated for publication) (easement by estoppel
found where, for at least twenty years, landlocked claimants used access, moved
in a mobile home and established permanent residence); Russell v. Rawls, No. 08-00-0546-CV, 2003 Tex. App. LEXIS 2369, at *11-12
(Tex.App.--El Paso March 20, 2003, no pet.) (not designated for publication) (finding permissive, acquiescent conduct constituted
representation where, for more than ten years, owner of landlocked track
traveled road to care for self and landowner of the servient estate who was in
failing health).





[17]"Where
the landowners had another method of access to their properties but used a
second roadway as a matter of convenience to reach their property, there can be
no implied easement over the second roadway because there is no
necessity."Â  Duff v. Mathews, 158 Tex. 333, 311
S.W.2d 637, 643 (1958).Â  See Adams v. Norsworthy
Ranch, Ltd., 975 S.W.2d 424, 429
(Tex.App.--Austin 1998, no pet.). Moreover, "impassibility of a [second]
road gives a party no right to an easement."Â  Duff, 311 S.W.2d at 643.Â  See Roberts v. Allison,
836 S.W.2d 185, 188 (Tex.App.--Tyler 1992, writ denied) (impassability of
alternative route not notice of an easement claim); Sentell v. Williamson County, Texas, 801 S.W.2d 220, 223
(Tex.App.--Austin 1990, no pet.) (no matter
that alternate route is "too steep or too narrow, or that other and like
difficulties exist").Â  "When
one has access to a part of his tract of land by way of travel over his own
property, this, as a matter of law, is a better and more direct route than one
which burdens an adjacent landowner."Â 
Id. 





[18]While
the Ingrums erected some cattle pens and a couple of windmills on their
property, there is no evidence they were built in reliance on use of the
pasture road.Â  The improvements were
consistent with the Ingrums overall use of their property as a cattle ranch.Â  Given there were alternative means of access
to the Ingrum property and the value of the improvements would not be lost or
rendered valueless if the pasture road could not be used, evidence of the
improvements represents less than a scintilla in support of detrimental
reliance.Â  In addition, the evidence at
trial indicated the cattle pens had largely rotted and the windmills were in
disrepair when Cockrell took ownership of the Ingrum property. 





[19]Moreover,
"[t]he use of a way over the land of another when the owner is also using
the same is not such adverse possession as will serve as notice of a claim of
right, for the reason that the same is not inconsistent with a license from the
owner."Â  Othen, 226 S.W.2d at 627.





[20]A license in real estate merely confers
a privilege to do some act or acts upon the land without conveying any interest
in or title to the land itself;Â  Samuelson v. Alvarado, 847 S.W.2d 319,
323 (Tex.App.--El Paso 1993, no pet.), and is revocable at will.Â  Drye,
364 S.W.2d at 203.Â 






[21]Although
this statute was subsequently amended in 2009; Act of June 29, 2009, 81st Leg.,
R.S., ch. 901, Â§ 1, 2009 Tex. Gen. Laws, 2431, this suit is governed by the law
in effect immediately before the effective date of the amendment, September 1,
2009.Â  Id. at Â§ 2.Â  Further, for convenience, we will cite to section
16.034 of the Texas Civil Practice and Remedies Code throughout the remainder
of this opinion simply as "section 16.034" or Â§ 16.034."Â  





[22]In general,
attorney's fees are not recoverable unless provided for by statute or between
the parties.Â  New Amsterdam Casualty Company v. Texas
Industries, Inc., 414 S.W.2d 914, 915 (Tex. 1967).Â  Such statutory provisions for the recovery of
attorney fees must be strictly construed because they are penal in nature and
are in derogation of the common law.Â  Id.Â Â Â  

Â 





[23]See Spruell v. Goelzer, No.
13-98-070-CV, 1999 Tex. App. LEXIS 6493, at *3 (Tex.App.--Corpus Christi Aug.
26, 1999, no pet.) (not designated for publication).